THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIE SKILLOM, Defendant-Appellant.

First District (6th Division)   No. 1—04—0627

Opinion filed October 21, 2005.

Michael J. Pelletier and Ann B. McLennan, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb and Amy Watroba Kern, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'MALLEY delivered the opinion of the court:

The State charged defendant Willie Skillom by information with one count of aiding the escape of Edward Carter, a person in the "lawful custody" of a peace officer arising from an incident that occurred on September 29, 2002. The State also charged Skillom with one count of attempted disarming of a police officer and one count of criminal damage to property exceeding $300 but less than $1,000, a charge which the State later nol-prossed. After a bench trial, the Honorable Camille E. Willis found Skillom guilty of aiding escape and not guilty of attempted disarming of a police officer. The court then sentenced defendant to six years' imprisonment.

On direct appeal, Skillom argues that the State failed to prove that the police had probable cause to arrest Edward Carter; accordingly, Skillom asserts that the State failed to prove his guilt beyond a reasonable doubt because it failed to prove that he aided the escape of someone in "lawful custody" of a peace officer. Skillom also argues that the trial court erroneously admitted hearsay evidence against him at trial. For the reasons that follow, we affirm Skillom's conviction and sentence.

## BACKGROUND

At trial, Chicago Heights police officers Greg Stepich and Christopher Burke testified that on September 29, 2002, they were on duty in the vicinity of 15th Street and Portland Avenue in Chicago Heights, Illinois.[1] At approximately 1 a.m., they heard what sounded like gunshots coming from the 1500 block of Wentworth Avenue. In

---

[1]For the sake of accuracy, we note that Officer Stepich testified during the State's case-in-chief, while Officer Burke testified in rebuttal after the close of defendant's case. For the sake of brevity, we collectively summarize those portions of Stepich's testimony and Burke's testimony that were identical.

response, Stepich and Burke drove eastbound on 15th Street toward Wentworth Avenue. The officers were in full uniform and were driving a marked Chicago Heights police vehicle.

As they approached the 1500 block of Wentworth Avenue, the officers saw several vehicles fleeing from the intersection of Wentworth and 16th Avenue and saw a large crowd at that intersection. As they drove up, they each saw an unidentified African-American male waving at them from inside a white vehicle heading westbound on 15th Street. Both Stepich and Burke testified that they heard the unidentified man shout "Little Edward's shooting." Stepich and Burke each testified that they knew that "Little Edward" was the nickname of Edward Carter.

At trial, the following exchange occurred when Officer Stepich testified on direct examination about having heard the unidentified man state that "Little Edward's shooting:"

"A. [by the witness, Officer Stepich:] On the way to Wentworth, a male black subject in a white colored car was waving at us, he was traveling westbound on 15th Street. We slowed down for him, we were trying to get to the call and he said 'Little Edward's shooting, Little Edward's shooting.'

DEFENSE COUNSEL: Objection.

THE COURT: That is stricken. Hearsay testimony.

THE STATE: Judge, it's not for the truth of the matter, it's going to the foundation or for the purpose of this investigation.

THE COURT: Counsel, they are contesting it, it does not go to the truth of the matter asserted.

DEFENSE COUNSEL: Fine, your Honor.

THE COURT: Based upon that statement I am going to reverse myself and overrule your objection.

DEFENSE COUNSEL: You know what, Judge? Actually, if I may, may I withdraw my objection?

THE COURT: Withdrawn, fine. The testimony will stand."

During cross-examination by defense counsel, Stepich admitted that he left out any reference to the unidentified man from the report. He further admitted his report contains no mention of hearing any person state "Little Edward's shooting."

The officers testified that after they heard the statements of the unidentified man, they approached the 1600 block of Wentworth and saw Edward Carter and another man, later identified as the defendant, Willie Skillom, standing in the middle of the street. The officers also testified that they saw Carter and Skillom running from the group. Stepich exited the police car and ordered the men to "stop running" and to "come over to the police car." When Carter and Skillom continued to flee, Stepich pursued them on foot through an alley

between Fifth Avenue and Wentworth. Burke remained with the car to contact the police dispatcher by radio.

Officer Stepich testified that as he chased Carter into the backyard of a house at 1512 Fifth Avenue, Carter ran into a cable stretching between two houses and fell down. Stepich then attempted to handcuff Carter, who fought back. Stepich wrestled with Carter for one to two minutes and eventually subdued him by putting one knee in the small of Carter's back and handcuffing Carter's wrists.

Stepich testified that as he pulled Carter off the ground, he felt a push from behind. As Stepich regained his balance, he turned and saw that he had been pushed by Willie Skillom. Stepich testified that he and Skillom fought, and that, during this struggle, Skillom grabbed at Stepich's shirt, duty belt, radio holder, and handgun, which was in a specially designed holster on Stepich's belt. Stepich subdued Skillom by striking him in the leg with a police baton until Skillom fell to the ground. At that time, Officer Burke drove up and assisted Officer Stepich in placing Skillom in handcuffs. Once he handcuffed Skillom, Stepich noticed that Carter had fled.

Officer Burke testified that after Officer Stepich pursued Carter and Skillom on foot, he had contacted the police dispatcher then tried to contact Officer Stepich via radio. Hearing no response, Burke drove his car around the area trying to locate Stepich. Officer Burke drove up and assisted Officer Stepich in placing Skillom in handcuffs. Burke testified that he saw Skillom and Officer Stepich struggling in the yard, and that Burke came to Stepich's aid in subduing and handcuffing Skillom.

Stepich and Burke each testified that they had difficulty attempting to put Skillom in the police car. Both officers also testified that Skillom head-butted Officer Stepich while in the backseat of the police car. Stepich further testified that Skillom repeatedly kicked him and that Stepich had to hold Skillom down during most of the ride to the police station.

The defense submitted the stipulated testimony of Tom Rogers, another Chicago Heights police officer. Rogers' stipulation provided that on September 30, 2002, pursuant to an investigation into the incident of September 29, 2002, he observed a handgun holster that belonged to Officer Stepich. Rogers' stipulation provided that Rogers would have testified that the holster was damaged and that the holster was inventoried under tag number 34173. The holster itself was never introduced as evidence, a fact that defense counsel discussed during closing argument.

Willie Skillom testified on his own behalf that on the evening of September 28, 2002, he was at a party at the intersection of 16th

Street and Wentworth in Chicago Heights, Illinois. At about 12:45 a.m. on September 29, 2002, he left the party and began walking to his mother's house. While walking on Wentworth toward 15th Street, Skillom heard several gunshots. As he approached the corner, he saw his brother, Edward Carter, and his friend, Mark Williams, standing on the corner of Fifth Avenue and 15th Street. Skillom testified that he spoke with his brother for 5 to 10 minutes before Stepich and Burke arrived in a marked police car.

Skillom then testified that when the police arrived, they ordered him and Edward Carter to put their hands on the squad car and that they complied. Skillom testified that as he was being handcuffed by Burke and placed into the back of the police car, Carter ran away and Officer Stepich ran after him. Skillom testified that he was waiting quietly in the car as Officer Burke checked to see if there were any outstanding warrants on him. He further testified that when Officer Stepich returned from his pursuit, Stepich struck him in the face. Skillom admitted to putting his feet up to protect himself when Stepich hit him, but he denied head-butting Stepich. Skillom also denied fighting with Stepich and further denied that he helped Edward Carter escape.

The trial court found Skillom guilty of aiding the escape of Edward Carter but not guilty of attempted disarming of a police officer. The court then sentenced defendant to six years' imprisonment. This appeal follows.

## ANALYSIS

On direct appeal, Skillom raises two arguments. First, he asserts that the State failed to prove his guilt beyond a reasonable doubt because it failed to prove that he aided the escape of a person in the "lawful custody" of a peace officer. More specifically, Skillom argues that the State failed to prove that the police had probable cause to arrest Edward Carter and thus concludes that the State failed to prove an essential element of aiding escape. In response, the State argues that the "aiding escape" statute (720 ILCS 5/31—7(e) (West 2002)) does not require the State to prove that the escapee had been subject to arrest accompanied by probable cause. In the alternative, the State argues that evidence at trial was sufficient to show that the police did have probable cause to arrest Edward Carter.

Second, Skillom argues that the trial court erroneously admitted hearsay evidence against him at trial, namely, the statements of the unidentified African-American male who purportedly stated "Little Edward's shooting." The State argues that Skillom waived any objection to the admission of the purported hearsay statements of the

unidentified eyewitness when defense counsel withdrew his objection to the evidence and did not mention it in his motion for a new trial.

We address each of these arguments in turn.

## A. Whether the State Proved All the Elements of the Offense of Aiding Escape Beyond a Reasonable Doubt

On appeal, defendant notes that the aiding escape statute, section 31—7(e) of the Criminal Code of 1961 (720 ILCS 5/31—7(e) (West 2002)), makes it a crime to aid in the escape of a person who is in the "lawful custody of a peace officer." He next argues that "lawful custody" is synonymous with "arrest accompanied by probable cause," and concludes that the State failed to prove beyond a reasonable doubt the presence of probable cause to arrest Edward Carter. From this line of reasoning, Skillom concludes that the State failed to prove him guilty beyond a reasonable doubt of aiding the escape of Edward Carter.

When considering a challenge to a criminal conviction, a reviewing court is usually called upon to determine whether, when viewing evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979); *People v. Edwards*, 209 Ill. 2d 194, 209 (2004). In this case, however, we must first determine the elements of "aiding escape" as set forth in section 31—7(e). This requires us to interpret the aiding escape statute, a question of pure law which we review *de novo*. See *People v. Hanson*, 212 Ill. 2d 212, 216-17 (2004) (reviewing courts consider questions of statutory interpretation *de novo*). In so doing, we are mindful that the cardinal rule of statutory construction is to ascertain and give effect to the true intent of the legislature. See *People v. Alexander*, 204 Ill. 2d 472, 485 (2003).

Here, the State charged Skillom with violating section 31—7(e), which reads, in relevant part, as follows:

> "Whoever knowingly aids a person in the lawful custody of a peace officer for the alleged commission of a felony offense in escaping from custody commits a Class 2 felony \*\*\* ." 720 ILCS 5/31— 7(e) (West 2002).

Defendant asserts that the statute's use of the phrase "lawful custody" is a reference to an arrest accompanied by probable cause. The defendant, however, fails to cite any legal authority where the phrase "lawful custody" means an arrest accompanied by probable cause. In fact, as the State points out, there is recent, relevant authority from this court explicitly rejecting that interpretation. *People v. Brexton*, 343 Ill. App. 3d 322 (2003).

■ Although the *Brexton* court considered a purported violation of the "escape" statute rather than the "aiding escape" statute, the two statutes use almost identical language. The aiding escape statute provides:

> "Whoever knowingly aids a person in the lawful custody of a peace officer for the alleged commission of a felony offense in escaping from custody commits a Class 2 felony ***." 720 ILCS 5/31—7(e) (West 2002).

The escape statute provides:

> "A person in the lawful custody of a peace officer for the alleged commission of a felony offense and who intentionally escapes from custody commits a Class 2 felony ***." 720 ILCS 5/31—6(c) (West 2002).

Both statutes use the phrase "lawful custody" to describe the condition of the escapee, and both describe very similar crimes. Also, the defendant in *Brexton* argued, just as Skillom argues in the instant case, that the statute's use of the phrase "lawful custody" meant that the State must prove that there was probable cause to arrest the alleged escapee.

The *Brexton* court, however, affirmed Mr. Brexton's conviction for escape and explicitly rejected Mr. Brexton's interpretation of the phrase "lawful custody." *Brexton*, 343 Ill. App. 3d at 326. After examining the holdings in *People v. Lauer*, 273 Ill. App. 3d 469, 474 (1995) (affirming the escape conviction of defendant when a police officer had restrained the defendant and physically moved him from the back to the front room of a house before the defendant broke free and ran out the back door of the house), and *People v. Kosyla*, 143 Ill. App. 3d 937, 951-52 (1986) (reversing the conviction of a defendant convicted of escape because the State never proved that the police ever established "custody" over defendant; officer only told the defendant that he was under arrest without establishing physical custody over defendant), the *Brexton* court stated that Illinois courts traditionally define "lawful custody" by looking to the level of control exercised by the police over the defendant, rather than the existence or absence of probable cause to arrest. *Brexton*, 343 Ill. App. 3d at 326. The court then held as follows:

> "Thus, given that (1) section 31—6 [the escape statute] does not mention probable cause, (2) the case law is contrary to defendant's position, and (3) the usual challenge to probable cause places the initial burden on the defendant, we conclude that the State did not have the burden to demonstrate that probable cause existed when defendant was taken into custody for retail theft." *Brexton*, 343 Ill. App. 3d at 326.

In our view, the escape statute at issue in *Brexton* and the aiding

escape statute at issue in the instant case are so similar, especially in their respective uses of the phrase "lawful custody," that the interpretation of the phrase "lawful custody" provided by the *Brexton* court should also apply to our interpretation of the aiding escape statute. Thus, we hold that section 31—7(e)'s use of the phrase "lawful custody" does not mean that the State must prove that the police had probable cause to arrest the escapee in order to convict a defendant of the offense of aiding escape.

While we find that *Brexton* convinces us that the defendant's interpretation of the statute is wrong, we also disagree with the State's suggestion that we should only consider whether the police had the defendant in physical custody. We agree with the *Brexton* court that the phrase "lawful custody" does not mean the same thing as arrest accompanied by probable cause, though we also note that the *Brexton* court never directly addressed what meaning should be given to the word "lawful" in the phrase "lawful custody." The State urges us to ignore the word "lawful" and focus exclusively on the word "custody" in our application of the aiding escape statute. We cannot, however, ignore the fact that the General Assembly, in enacting the aiding escape statute, qualified the term "custody" with the word "lawful." It is a basic precept of statutory interpretation that a court must give meaning to each and every word in the statute. See *Kraft, Inc. v. Edgar*, 138 Ill. 2d 178, 189 (1990) (noting that statutes "should be construed so that no word or phrase is rendered superfluous or meaningless"); see also *Snyder v. Olmstead*, 261 Ill. App. 3d 986, 989-90 (1994) (noting that "[e]ach word, clause, or sentence must not be rendered superfluous but must, if possible, be given some reasonable meaning"). Thus, we must determine what meaning the General Assembly intended when it enacted the aiding escape statute using the phrase "lawful custody." 720 ILCS 5/31—7(e) (West 2002).

Before determining the meaning of this phrase, we reiterate the fundamental principles of statutory interpretation:

> " 'In the exercise of statutory construction, our primary task is to ascertain and effectuate the intent of the legislature. In interpreting a statute we may consider the reason and necessity for the law, the evils it was intended to remedy, and its ultimate aims. Also, we must assume that the legislature did not intend an absurd or unjust result. *However, our inquiry must always begin with the language of the statute, which is the surest and most reliable indicator of legislative intent. The language of the statute must be given its plain and ordinary meaning*, and where the statutory language is clear and unambiguous, we have no occasion to resort to aids of construction. Nor, under the guise of statutory interpretation, can

we "correct" an apparent legislative oversight by rewriting a statute in a manner inconsistent with its clear and unambiguous language. [Citations.]' " (Emphasis added.) *Village of Mundelein v. Franco*, 317 Ill. App. 3d 512, 517 (2000), quoting *People v. Pullen*, 192 Ill. 2d 36, 42 (2000).

The aiding escape statute provides no definition for the phrase "lawful custody." Also, there is no legislative history that provides any insight as to what specific meaning the General Assembly intended to give to the phrase "lawful custody" when it enacted the section 31— 7(e). Further, none of the cases addressing either the aiding escape statute or the escape statute address the meaning of the word "lawful" in the phrase "lawful custody." See *Brexton*, 343 Ill. App. 3d at 326 (noting that past Illinois cases have looked primarily at the issue of whether an alleged escapee was in "custody" for purposes of the escape statute). Where, as here, the statute provides no guidance on the meaning of a particular word or phrase, it is a "well-settled principle of statutory interpretation that undefined terms in a statute shall be given their ordinary and popularly understood meanings." *People v. Ward*, 215 Ill. 2d 317, 325 (2005), citing *Gem Electronics of Monmouth, Inc. v. Department of Revenue*, 183 Ill. 2d 470, 477-78 (1998), *People ex rel. Daley v. Datacom Systems Corp.*, 146 Ill. 2d 1, 15 (1991), and *People v. Hicks*, 101 Ill. 2d 366, 371 (1984). In this case, there is no dispute over the meaning of "custody"; instead, we will focus on the meaning of the adjective "lawful."

It is appropriate to turn to a dictionary when determining the meaning of an otherwise undefined word or phrase. See *Ward*, 215 Ill. 2d at 325 (relying heavily on Black's Law Dictionary in defining the statutory term "possession"). Black's Law Dictionary, arguably the definitive American legal dictionary and one that is routinely used by Illinois courts to aid in statutory interpretation (see *Ward*, 215 Ill. 2d at 325 (relying heavily on Black's Law Dictionary); see also *People v. Blair*, 215 Ill. 2d 427, 439-45 (2005) (relying heavily on Black's Law Dictionary in defining legal terms such as "waiver" and *"res judicata"*)), provides the following definition of "lawful"[2]:

"Not contrary to law; permitted by law <the police officer conducted a lawful search of the premises>. See LEGAL." Black's Law Dictionary 902 (8th ed. 2004).

Black's second definition of the word "legal" relates it to "lawful":

"legal, adj. *** 2. Established, required, or permitted by law; LAWFUL <it is legal to carry a concealed handgun in some states>." Black's Law Dictionary 912 (8th ed. 2004).

[2]A search of the electronic database Lexis-Nexis conducted on September 15, 2005, revealed the presence of 1,331 Illinois cases containing references to Black's Law Dictionary.

A popular and well-regarded nonlegal dictionary provides a similar definition of "lawful":

"1 \*\*\* being in harmony with the law <a ~ judgment> \*\*\* constituted, authorized, or established by law : RIGHTFUL <~ institutions>.

2 \*\*\* LAW-ABIDING <~ citizens>[.]" Merriam-Webster's Collegiate Dictionary 659 (10th ed. 1999).

Construing these definitions of the word "lawful" in light of this court's prior rulings interpreting the phrase "lawful custody" (see *Brexton*, 343 Ill. App. 3d at 326 (and cases cited therein)), we find that section 31—7(e) prohibits a person from aiding the escape of any person who is in the physical custody of a peace officer who was acting in a manner permitted or authorized by law. Thus, we find that if a police officer, in carrying out his duties as a peace officer in a manner permitted by law, places a person in custody, we can say that the person was in "lawful custody of a peace officer" as defined by section 31—7(e). 720 ILCS 5/31—7(e) (West 2002).

While we acknowledge that this interpretation has not been explicitly articulated by other Illinois courts considering either the aiding escape statute or the escape statute, we note that this decision does not present a new interpretation of the phrase "lawful custody." Instead, we are making an explicit statement of the plain meaning of the statute. Further, by explicitly stating the plain meaning of the phrase "lawful custody," we prevent an absurd or illogical interpretation of the statute. To consider the adjective "lawful" to be mere surplusage, as the State suggests, would be to ignore the directive of the Illinois Supreme Court, which has repeatedly endorsed the canon that we must give meaning to all the words in a statute enacted by the Illinois General Assembly. See *Kraft*, 138 Ill. 2d at 189 (statutes should not be interpreted to render a word or phrase "superfluous or meaningless"); see also *Snyder v. Olmstead*, 261 Ill. App. 3d at 989-90 (noting that "[e]ach word, clause, or sentence \*\*\* must, if possible, be given some reasonable meaning").

Further, the interpretation of the statute discussed above avoids absurd results. See *Village of Mundelein v. Franco*, 317 Ill. App. 3d at 517 (noting that a reviewing court " 'must assume that the legislature did not intend an absurd or unjust result' "), quoting *Pullen*, 192 Ill. 2d at 42. If, for example, an off-duty police officer were to unlawfully harass a citizen and then unlawfully restrain that citizen, it would be absurd to find that the person was in "lawful custody." Consider the case of *People v. Becker*, 315 Ill. App. 3d 980 (2000). Defendant Becker, an off-duty police officer, provoked an altercation with a stranger. *Becker*, 315 Ill. App. 3d at 982-83. The defendant retrieved a gun from

his car, identified himself as a policeman, and threatened to arrest and imprison the stranger; the two men scuffled and the stranger was shot and killed. *Becker*, 315 Ill. App. 3d at 984-86. A police officer testified at the trial that department rules prohibited defendant from engaging in an unjustifiable altercation with a citizen and from using his weapon in an unlawful manner, whether an officer was on duty or off duty. See *Becker*, 315 Ill. App. 3d at 985. The court found that "by displaying that weapon and engaging in an altercation with the victim, defendant committed an act contrary to his training and contrary to the oath he took as a police officer." *Becker*, 315 Ill. App. 3d at 1004 (affirming one of defendant's convictions for official misconduct but reversing and remanding on other counts, including armed violence, involuntary manslaughter and official misconduct, the court found that, based on the totality of the circumstances, there was "sufficient evidence to prove defendant guilty beyond a reasonable doubt of official misconduct and armed violence"). If we were to adopt the State's interpretation of the phrase "lawful custody" and ignore the use of the word "lawful" in the aiding escape statute and focus exclusively on physical custody, then a person helping the victim in *Becker* escape would have been open to prosecution under section 31—7(e). Such an interpretation would create an absurd result that the General Assembly could not have intended.

■ The interpretation suggested by the plain language of the statute, however, is that if a police officer (whether on duty or not) is acting pursuant to his duties as a police officer and places a person in custody, that apprehended person is in "lawful custody." This is true even if it later proves that the police arrested the wrong person or did not have probable cause to arrest that particular person. We further note that this interpretation in no way creates a defense to the offense of aiding escape, nor does it encourage citizens to engage in some sort of on-the-street legal analysis as to whether a particular officer is acting pursuant to his official duty, any more than it encourages a citizen to engage in an analysis of whether he or she is actually in physical custody of a police officer. We simply hold that in a prosecution for aiding escape, the burden is on the prosecution to show that the peace officer was acting in accordance with his duties as a police officer. This burden is not unduly onerous.

■ In this case, the evidence elicited at trial proved beyond a reasonable doubt that the police were acting in a manner permitted by law and had Edward Carter in "lawful custody." On the night in question, Officer Stepich was employed as a police officer by the City of Chicago Heights, Illinois. At the time that Officer Stepich placed Edward Carter in physical custody, Stepich had been carrying out his

official duties as a peace officer. Specifically, while Stepich and his partner were investigating the firing of a handgun, Stepich identified Carter as a potential suspect, saw him flee, and pursued him. When he placed Carter in handcuffs, he had Carter in "custody." See *Brexton*, 343 Ill. App. 3d at 326. On these facts, there can be no question that the prosecution proved beyond a reasonable doubt that Edward Carter was in the "lawful custody of a peace officer" as defined by the aiding escape statute. 720 ILCS 5/31—7(e) (West 2002). Thus, the State met its burden of proof in this case.

## B. Whether the Trial Court Erred in Admitting Into Evidence the Purported Hearsay Statements of an Unidentified Person

■ Defendant next contends that the trial court erred when it permitted Officer Stepich to testify that while on the way to the scene of the alleged shooting, he saw an unidentified African-American man and heard that unidentified man state that "Little Edward's shooting." According to defendant, this testimony constituted inadmissible hearsay and constitutes plain error requiring this court to remand this matter for a new trial.

First, it is not clear that the statements of the unidentified person were inadmissible. Though technically hearsay, the statements may have been admissible through a hearsay exception allowing testimony showing the course of the police investigation or an excited utterance. See generally M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 803.3, at 693-700 (discussing the excited utterance exception to hearsay), § 803.13, at 732-36 (discussing the use of testimony gathered in the course of a police investigation) (8th ed. 2004). We need not address whether a hearsay exception applied, however, because defense counsel explicitly and intentionally waived this issue at trial. The record reveals that defense counsel initially lodged a hearsay objection to Stepich's testimony as to the statements of the unidentified person. When the trial court originally sustained counsel's objection, the prosecutor argued that the alleged hearsay ought to be admitted because it showed the course of Officer Stepich's investigation. Defense counsel acceded to the admission of Stepich's testimony for this limited purpose, saying that was "fine." Defense counsel then reconsidered his position and explicitly requested that the trial court permit him to withdraw the hearsay objection; the court granted his request. Later, when defense counsel filed a posttrial motion, he did not include the admission of the hearsay testimony as a ground for new trial. The law is clear that failure to object to an evidentiary issue at trial, and we consider defense counsel's explicit and intentional withdrawal of the objection to mean that there is no objection on the

record, combined with counsel's subsequent failure to raise an issue in a motion for new trial bars consideration of the alleged evidentiary issue on appeal. See *People v. Jackson*, 84 Ill. 2d 350, 358-59 (1981) (a defendant who fails to raise an issue and obtain a ruling thereon in the trial court or who fails to present an issue on his motion for a new trial waives the issue and cannot raise or rely on such issue for the first time on appeal); see also *People v. Enoch*, 122 Ill. 2d 176, 185-86 (1988) (where a defendant fails to raise alleged points of error in a written motion for a new trial, the issue is waived on subsequent appellate review).

In an attempt to circumvent waiver, Skillom argues on appeal that trial counsel's failure to maintain the hearsay objection at trial and to renew the objection in a motion for new trial constituted ineffective assistance of counsel. We find, however, that counsel's decision to permit the admission of this evidence was a matter of trial strategy and thus did not constitute ineffective assistance of counsel. See *Strickland v. Washington*, 466 U.S. 668, 690-92, 80 L. Ed. 2d 674, 695-96, 104 S. Ct. 2052, 2066-67 (1984) (a successful claim alleging ineffective assistance of counsel demonstrates that defense counsel's performance fell below an objective standard of reasonableness and that this substandard performance caused prejudice by creating a reasonable probability that, but for counsel's errors, the trial result would have been different); *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984) (applying the *Strickland* standard). See also *People v. Orange*, 168 Ill. 2d 138, 153 (1995) (noting that a decision which involves a matter of trial strategy will generally not support a claim of ineffective representation).

As an example of counsel's strategy, one sees that counsel cross-examined Stepich on discrepancies between Stepich's direct testimony and his official police report. Arguably the most significant inconsistency brought out by counsel concerned the alleged hearsay statements that are at issue here. Although Stepich testified on direct that he heard an unidentified African-American male state that "Little Edward" was "shooting," Stepich made no mention of this person or statement in the police report. By impeaching Stepich with his police report, defense counsel sought to undermine the credibility of Officer Stepich.

Although the trial court ultimately found Officer Stepich to be credible, it is obvious from counsel's cross-examination that counsel's decision to permit the admission of this evidence to create an opportunity for impeachment was a matter of trial strategy. We cannot say that counsel's strategy was unreasonable; the fact that the strategy was ultimately unsuccessful is not a sufficient reason to deem his

representation ineffective. See *People v. Palmer*, 162 Ill. 2d 465, 480 (1994) (noting that mere errors in trial strategy does not establish incompetence, " 'even if [this judgement is shown to be] clearly wrong in retrospect' "), quoting *United States v. Yancey*, 827 F.2d 83, 90 (7th Cir. 1987). In our view, counsel's decision to withdraw the objection to the alleged hearsay statements was trial strategy; such tactical decisions, even if ultimately unsuccessful, are generally not sufficient to support a successful claim of ineffective assistance of trial counsel. See *Orange*, 168 Ill. 2d at 153 (holding that trial counsel's decision to submit evidence to the jury that his confession was coerced, rather than submitting the evidence to the judge in a motion to suppress, was a matter of trial strategy and thus did not constitute ineffective assistance).

Defendant also argues that we should overlook counsel's intentional waiver of the alleged hearsay issue because the admission of the alleged hearsay constitutes plain error. The plain error doctrine is an exception to the waiver rule that is applicable where the record shows the commission of an error affecting substantial rights or where the error occurs in a case where the evidence is closely balanced. *People v. Young*, 128 Ill. 2d 1, 46 (1989). In the instant case, however, the plain error doctrine does not apply. First, the hearsay evidence in this case did not even mention Willie Skillom. Instead, it described the alleged actions of Edward Carter. Although defendant argues that the hearsay evidence provided the only evidence to prove that there was probable cause to arrest Edward Carter for the shooting, we have found that probable cause to arrest the escapee is not an element of the offense of aiding escape. See *People v. Brexton*, 343 Ill. App. 3d 322, 326 (2003). In our view, because the alleged hearsay evidence neither mentioned Skillom nor related directly to any of the evidence concerning Skillom's actions in aiding Carter's escape, the alleged error did not affect Skillom's substantial rights. As such, we see no reason to overlook counsel's intentional wavier of this alleged error.

Further, we cannot say that the evidence against Skillom was closely balanced. Two witnesses, Officers Stepich and Burke, testified as to Skillom's actions at trial. The trial court found their testimony to be credible. Each officer described how in the early morning of September 29, 2002, they proceeded to an area where they had heard gunshots. They each saw Edward Carter and Willie Skillom at the scene of the alleged shooting, and each officer testified that Carter and Skillom fled when they saw the police arrive. Officer Stepich testified that he caught Carter and put him in handcuffs, but that Carter escaped when Skillom attacked Stepich from behind. Burke corroborated Stepich's testimony when he testified that he saw Skillom

fighting with Stepich. The stipulation of Officer Rogers, which stated that Rogers observed the damage caused to Stepich's gun holster the day after Stepich's struggle, also provided corroboration. Defendant's testimony, however, lacked corroboration, and the trial court rejected it. Defendant's primary argument as to why the evidence at trial was closely balanced is that, absent the statements of the unidentified man, there was no probable cause to arrest Edward Carter. Again, however, probable cause to arrest the escapee is *not* an element of the offense of aiding escape. See *Brexton*, 343 Ill. App. 3d at 326. Because the evidence against Willie Skillom was not closely balanced, we find no reason to reject the State's waiver argument.

Because trial counsel withdrew his objection to the purported hearsay testimony of Officer Stepich, and because trial counsel did not raise this purported error in his motion for new trial, the issue is waived for purposes of this appeal. Further, because counsel's decision to permit the admission of this evidence was a matter of trial strategy, we reject the argument that we should overlook this waiver due to the ineffectiveness of trial counsel. Finally, the plain error doctrine does not apply because the purported error did not affect Skillom's substantial rights and the evidence against him at trial was not closely balanced. Thus, we affirm defendant's conviction and we reject defendant's argument that his conviction was based on improper evidence.

## CONCLUSION

For the reasons discussed above, we affirm the conviction and sentence of Willie Skillom for the offense of aiding escape.

Affirmed.

FITZGERALD SMITH and TULLY, JJ., concur.